**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-695**

JODY ROSE, ADMINISTRATRIX OF
THE ESTATE OF KYREE DEVON
HOLMAN, DECEASED,

       Plaintiff,

vs.

PSA AIRLINES, INC. GROUP
INSURANCE PLAN, PSA AIRLINES
GROUP HEALTH BENEFIT PLAN,
PSA AIRLINES PLAN B EMPLOYEE
BENEFIT PLAN, PSA AIRLINES, INC.,
PSA AIRLINES SHARED SERVICES
ORG., UMR, INC., QUANTUM
HEALTH, INC. *aka* MYQHEALTH
BY QUANTUM, and MCMC, LLC,

       Defendants.

_____

## COMPLAINT

<u>PARTIES</u>

1.     Plaintiff, Jody Rose, is the duly appointed Administratrix of the Estate of Kyree

Devon Holman, Deceased ("the Estate") by virtue of appointment by the Superior Court of

Mecklenburg County, North Carolina, in File No. 19-E-955.

2.     A true and accurate copy of the Letters of Administration issued by the

Superior Court of Mecklenburg County, North Carolina, File No. 19-E-955, is attached hereto

as <u>Exhibit 1</u>.

3.     Plaintiff brings this action as the lawful representative of the Estate, for the

exclusive benefit of the next of kin and beneficiaries of Kyree Devon Holman.

4.     Pursuant to the Health Benefit Summary Plan Description ("SPD"), Defendant "PSA Airlines Group Health Benefit Plan" is a self-funded health and welfare benefit plan providing group health benefits to PSA Airlines, Inc. employees and dependents.

5.     Pursuant to the Form 5500, Defendant "PSA Airlines, Inc. Group Insurance Plan" is a self-funded health and welfare benefit plan providing group health benefits to PSA Airlines, Inc. employees and dependents.

6.     Pursuant to other plan documents produced by Defendants, Defendant "PSA Airlines Plan B Employee Benefit Plan" is a self-funded health and welfare benefit plan providing group health benefits to PSA Airlines, Inc. employees and dependents.

7.     Because of the discrepancies in plan names in the various legally required plan documents, as alleged above, all three plan entity names are named as defendants in this action, and are referred to individually and collectively herein as "the Plan."

8.     Upon information and belief, the Plan is an "employee welfare benefit plan" within the meaning of section 1002(1) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").

9.     The Plan is subject to being sued as a separate entity pursuant to 29 U.S.C. § 1132(d)(1).

10.    Defendant PSA Airlines, Inc. ("PSA") is a corporation organized and existing under the laws of the State of Pennsylvania with its principal office in Ohio, and is registered in North Carolina and does substantial business in the Western District of North Carolina.

11.    Pursuant to the Plan and the SPD, PSA is the Plan Administrator of the Plan, as well as the Plan Sponsor and named fiduciary of the Plan.

12.    Pursuant to the Plan's Form 5500, Defendant "PSA Airlines Shared Services

Org." is the Plan Administrator of the Plan and is located in Middletown, Pennsylvania. It is unclear at this time whether it is an incorporated or formal entity, or is otherwise a separate entity from PSA Airlines, Inc.

13.     Because different plan administrators appear to be designated in different required ERISA documents, as alleged above, both are named as defendants in this action, and are referred to collectively herein as "PSA."

14.     Defendant UMR, Inc. ("UMR") is a corporation organized and existing under the laws of the State of Delaware with its principal office in Wisconsin, and is registered in the North Carolina and does substantial business in the Western District of North Carolina.

15.     Defendant UMR provides claim administrative services for the Plan such as making claim payments for medical claims and is the named "claims appeal fiduciary for medical claims" by the Plan.

16.     Defendant Quantum Health, Inc. *aka* MyQHealth by Quantum ("Quantum") is a corporation organized and existing under the laws of the State of Delaware with its principal office in Ohio, and does substantial business in the Western District of North Carolina.

17.     On information and belief, Defendant UMR contracted with Quantum to perform certain of UMR's claim administration responsibilities, including as they related to the handling the claim and appeal processing and determinations and the external review coordination at issue in this lawsuit.

18.     MCMC, LLC ("MCMC") is a limited liability company organized and existing under the laws of the State of Delaware with its principal office in Massachusetts and its external review office in Maryland, and is registered in North Carolina and does substantial business in the Western District of North Carolina.

3

19.     Defendant MCMC contracted to provide external review services to the claim at issue in this lawsuit on behalf of or at the direction of some or all of the other defendants.

20.     Defendants are fiduciaries under ERISA.

JURISDICTION AND VENUE

21.     This Court has jurisdiction to hear Plaintiff's claim pursuant to 28 U.S.C. § 1331, in that the claims arise under the laws of the United States. Specifically, Plaintiff brings this action to enforce her rights under ERISA, as allowed by 29 U.S.C. § 1132.

22.     Venue in the Western District of North Carolina is appropriate by virtue of Plaintiff's presence in this district and Defendants doing substantial business in this district.

FACTUAL ALLEGATIONS

**A.     Background.**

23.     Kyree Devon Holman ("Kyree") was born on January 15, 1992.

24.     Kyree was employed as a flight attendant with PSA Airlines.

25.     On or about December 20, 2018, Kyree went to an urgent care with flu-like symptoms and was treated for acute bacterial bronchitis.

26.     On or about December 23, 2018, Kyree passed out in his hotel room in Canada on a work layover and was flown back to Charlotte, North Carolina

27.     On or about December 24, 2018, Kyree was admitted to Novant Hospital in Charlotte with an extremely elevated heart rate, syncope, and palpitations, which were treated with cardioversion.

28.     Thereafter, Kyree underwent a cardiac MRI which revealed myocarditis.

29.     On December 25, 2018, Kyree experienced a recurrent tachyarrhythmia requiring another cardioversion and suffered worsening biventricular function.

30.     On December 26, 2018, Kyree was medically air transferred to Duke University Hospital with acute heart failure and ventricular tachycardia, where he was found to be in cardiogenic shock upon arrival.

31.     Over the course of approximately the last week of 2018, Kyree underwent two biopsies, the second of which revealed giant cell myocarditis.

32.     Due to Kyree's acute infective myocarditis, he was evaluated for a heart transplant in early January, 2019.

33.     On information and belief, Kyree was number one on the heart transplant waiting list.

**B.    Initial Claim.**

34.     On or about at least January 2, 2019, January 8, 2019, January 9, 2019, January 11, 2019, January 14, 2019, and January 16, 2019, Kyree's medical team at Duke University Hospital ("Duke")[1] submitted clinical information, progress notes, medical records, test and lab results, and other relevant information related to Kyree's condition to Quantum in support of Kyree's heart transplant claim.

35.     On or about January 11, 2019, Duke submitted an urgent request for approval of a heart transplant on Kyree's behalf to Quantum by letter dated January 10, 2019.

---

[1]     A number of individuals and entities within the Duke health system submitted claims and appeals on Kyree's behalf, provided medical records and test/lab results to Defendants, wrote reports and letters, and otherwise evaluated, treated, communicated, and advocated on Kyree's behalf with respect to this claim, including but not limited to: Duke University Hospital, Duke University Medical Center, Duke University Medical Center Patient Revenue Management Organization, Duke University Cardiac Diagnostic Unit, Duke University Health System, Duke University Health System Department of Care Management, as well as various individual physicians, nurses, therapists, and other employees. As such, "Duke" is used throughout this Complaint as an umbrella term encompassing these various entities.

36.    On or about January 16, 2019, Duke submitted additional information to Quantum and again requested approval for a heart transplant on Kyree's behalf to Quantum.

37.    In filing Kyree's claim, Duke submitted supportive materials including but not limited to a letter from Duke's transplant coordinator, a letter from Duke's transplant cardiologist, a letter from Duke's cardiothoracic anesthesiologist, progress notes, consultation notes, diagnostic studies, research studies, clinical trial results, laboratory studies, and test results, among other clinical and medical records.

38.    By letter dated January 17, 2019, PSA and Quantum denied Kyree's heart transplant because "according to summary plan description language … this treatment is considered experimental or investigational … because the effectiveness has not been established" and "the health benefit plan excludes coverage for 'experimental drugs and medicines.'"

**C. Reconsideration of Kyree's Claim.**

39.    Duke submitted additional clinical information, progress notes, medical records, lab results, clinical criteria, and other supportive materials to Quantum on or about at least January 17, 2019, January 22, 2019, January 24, 2019, and January 25, 2019.

40.    As part of this review of Kyree's claim for a heart transplant, PSA and Quantum ordered a medical review to be performed by AllMed Healthcare Management, who assigned the review to Felix W. Tsai, M.D.

41.    In his report dated January 23, 2019, Dr. Tsai found that:

   a.    Kyree "does not meet all the InterQual criteria, specifically the alcohol abuse criteria;"

   b.    "[t]here are no other treatment possibility [sic] for this patient;"

6

c.      a prolonged wait for the transplant, including continued transfusions, will make finding an appropriate crossmatch for Kyree more difficult; and

d.      the denial of Kyree's claim for a heart transplant is upheld based on the policy because not all the InterQual criteria are met.

42.     Based upon Dr. Tsai's findings, by letter dated January 25, 2019, PSA and Quantum denied Kyree's claim for a heart transplant because it did not "meet the Plan's adopted clinical criteria because the information submitted does not show no drug or alcohol misuse by history or drug and alcohol free for at least six months," which PSA and Quantum claimed was a requirement of the Summary Plan Description.

43.     The clinical criteria relied upon to deny Kyree's claim for a heart transplant by PSA, Quantum, and Dr. Tsai were the InterQual 2018.2 Procedures Criteria related to Cardiac Transplantation ("InterQual criteria").

44.     The InterQual criteria does not contain any requirement or guideline that a heart transplant candidate has to be alcohol free for 6 months.

45.     Also on January 25, 2019, a document titled "Determination Letter" with a heading that contained the letterhead of "PSA Airlines" and "MyQHealth by Quantum Health" was issued containing a noncertification for Kyree's claim for a heart transplant, which also stated "[f]inal determination regarding payment will be made by the Plan's claims administrator, UMR."

**D.      Expedited Internal Appeal.**

46.     On January 25, 2019 – the very same day as the second denial was issued – Duke appealed Quantum's denial of Kyree's claim for a heart transplant.

47.     In filing Kyree's expedited appeal, Duke submitted additional supportive

materials including but not limited to Duke Transplant Center's "Heart Transplant Selection Criteria," psychiatry progress notes, and its complete initial claim package, lab studies, and test results, among other clinical and medical records.

48. Duke submitted additional medical records and lab results on or about at least January 28, 2019, January 30, 2019, and January 31, 2019.

49. Duke reiterated to Quantum and PSA that "[t]here is no other option but heart transplant at this time."

50. As part of its review of Kyree's expedited appeal, Quantum and PSA ordered a medical review of the claim to be performed by Medical Review Institute of America, LLC, who assigned the review to Alon Aharon, M.D.

51. In his report dated January 30, 2019, Dr. Aharon found that:

    a. the procedure was not medically necessary because Kyree met all of the InterQual criteria except abstinence from alcohol for 6 months;

    b. Kyree "will not survive without heart transplant;"

    c. "[t]he requested heart transplant is not considered medically necessary for this member's clinical scenario based on the submitted InterQual criteria;" and

    d. the previous denial of Kyree's claim for a heart transplant is upheld because the 6-month abstinence from alcohol InterQual criteria had not been met.

52. Based upon Dr. Aharon's findings, by letter dated January 31, 2019, Quantum and PSA denied Kyree's appeal of the denial of his claim for a heart transplant on the grounds that it did not meet medical necessity criteria because Kyree had not been alcohol free for 6 months.

53. The January 31, 2019 denial constituted Kyree's final internal administrative

8

remedy and exhausted the Plan's internal appeal process.

**E.  External Review.**

54.     On February 1, 2019 – the very next day after the final internal denial was issued by PSA and Quantum – Duke sought an expedited external review of Quantum's denial of Kyree's claim for a heart transplant.

55.     In filing Kyree's expedited external review request with Quantum, Duke marked the cover page "*URGENT*" in large handwritten letters and additionally designated it as "Urgent Response Needed."

56.     Duke submitted Kyree's external review request to Quantum at or about 2:57p.m. on February 1, 2019 and included a letter from Duke's transplant coordinator, a letter from Duke's medical director/transplant cardiologist, and additional clinical information, including but not limited to advanced heart failure, neurosurgery, speech pathology, infectious disease, and ophthalmology progress notes, as well as blood count, LDH, blood gas, arterial, chest x-ray, and other test/lab results, among other clinical and medical records.

57.     Duke again reiterated to Defendants that "[t]here is no other option but heart transplant at this time."

58.     On information and belief, Quantum transmitted Kyree's urgent external review request and medical records directly to MCMC.

59.     MCMC received Duke's urgent external review request and medical records at or about 3:21p.m. on February 1, 2019.

60.     In spite of the urgent request for review, MCMC performed Kyree's external review as a "standard" review to be decided within 45 days and not as an "expedited" review

9

to be decided within 72 hours, as had been requested.

61.     Quantum and PSA were aware that MCMC intended to perform the external review as standard (45 days) and not expedited (72 hours).

62.     On information and belief, Duke contacted MCMC to determine why it was processing Kyree's review as standard and not expedited and was told that Kyree's claim did not meet the criteria for an expedited review.

63.     Duke submitted additional medical records on or about at least February 4, 2019, February 5, 2019, February 8, 2019, and February 11, 2019.

64.     Had MCMC performed the external review on an expedited basis, as requested, its decision to allow Kyree's heart transplant would have been due no later than the afternoon of February 4, 2019.

65.     On February 9, 2019, while waiting for his transplant to be approved by Defendants, Kyree died in the cardiac unit at Duke Hospital, less than one month after his 27th birthday.

66.     On March 6, 2019, MCMC overturned Quantum and PSA's denial of Kyree's claim for a heart transplant.

67.     In its report dated March 6, 2019, among other findings, MCMC found that:

      a.     "[t]he requested service is not a Plan/Benefit exclusion as defined by the Summary Plan Description;"

      b.     "[a]lcohol use before cardiac transplant is not listed as a benefit exclusion;"

      c.     the heart transplant is not considered to be experimental/ investigational;

d.   the heart transplant is "considered clinically appropriate by medical specialist who perform cardiac transplant and reliable medical evidence would not consider some alcohol use a contra indication to cardiac transplant;"

e.   the heart transplant is medically necessary as defined by the Summary Plan Description;

f.   the heart transplant is being done "to save the patient's life;" and

g.   the denial of Kyree's claim for a heart transplant is overturned.

68.   No heart transplant was ever performed on Kyree, as he died 5 days after when the denial of his heart transplant should have been overturned, but approximately 4 weeks before the denial of his heart transplant was actually overturned.

69.   Kyree died as a direct and proximate result of being denied a heart transplant.

70.   Plaintiff has exhausted the appeal process and administrative remedies under the Plan, and this claim is ripe for judicial review pursuant to 29 U.S.C. § 1132.

FIRST CLAIM FOR RELIEF:
WRONGFUL DENIAL OF BENEFITS
UNDER ERISA, 29 U.S.C. § 1132(a)(1)(b)

71.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

72.   Defendants had a duty to provide health insurance coverage to Kyree under the terms of the Plan.

73.   Defendants wrongfully withheld health benefits due and owing under the Plan.

74.   Defendants have wrongfully denied benefits in violation of the Plan and SPD provisions, and ERISA, for the following reasons:

a.   The Plan and SPD allow for and provide coverage for the treatment;

11

b.      The heart transplant procedure prescribed by Kyree's medical team at Duke was reasonable and necessary to address his medical condition;

c.      Kyree was entitled to the health benefits, as the heart transplant procedure was medically necessary;

d.      Plaintiff, on behalf of Kyree, was wrongfully denied healthcare benefits due under the Plan;

e.      Defendants' interpretations of the definitions contained in the Plan are contrary to and exceed the permissible scope of the provisions of ERISA, the Plan, the SPD, and are unreasonable;

f.      Defendants failed to accord proper weight to the evidence in the administrative record and/or claim file;

g.      Defendants failed to accord proper weight to the opinions of Kyree's medical providers who know him and are familiar with his situation and condition;

h.      Defendants failed to accord proper weight to the evidence in the administrative record and/or claim file showing Kyree's treatment was medically necessary and covered by the terms of the Plan and SPD;

i.      Defendants' application of medical necessity criteria contained in the Plan and/or other criteria or guidelines is contrary to and exceeds the permissible scope of the provisions of ERISA, the Plan, the SPD, and is unreasonable;

j.      Defendants' finding that Kyree's heart transplant was excluded from coverage under the terms of the Plan due to it not being medically necessary was in error, violated the terms of the Plan, was arbitrary and capricious, and an abuse of discretion as a matter of law;

k.     Defendants' interpretation of and reliance upon InterQual criteria was unreasonable;

l.     Defendants' reliance upon inapplicable clinical criteria or guidelines, including but not limited to InterQual criteria, was in error and an abuse of discretion as a matter of law;

m.     Defendants' denial based upon their finding that Kyree had not been alcohol free for at least 6 months was in error, violated the terms of the Plan, and was an abuse of discretion as a matter of law;

n.     Defendants' denial based upon their finding that the procedure was experimental or investigational was in error, violated the terms of the Plan, and was an abuse of discretion as a matter of law;

o.     Plaintiff's claim met the relevant Plan standards, definitions, and criteria for coverage and/or certification;

p.     Defendants' denials of Kyree's claim for a heart transplant led directly and proximately to Kyree's death;

q.     Defendants' failure to ensure that the external review was conducted within 72 hours was in error, violated the terms of the Plan, was an abuse of discretion as a matter of law, and led directly and proximately to Kyree's death;

r.     Defendant MCMC's failure to conduct the external review on an emergency basis within 72 hours was in error, violated the terms of the Plan, was an abuse of discretion as a matter of law, and directly led to Kyree's death; and

s.     Plaintiff on behalf of Kyree has been treated differently from similarly-situated participants and beneficiaries;

75.     Kyree died waiting for a heart transplant due to Defendants' actions.

76.     By and through their conduct, actions, and inaction alleged herein, Defendants wrongfully denied health benefits to Kyree and Plaintiff under the Plan, the SPD, ERISA and its promulgating regulations, and as otherwise proscribed by law.

77.     Defendants have violated their contractual obligations to furnish health benefits to Kyree and Plaintiff.

78.     ERISA permits Plaintiff to sue for a denial of benefits, which is not extinguished by death either under case law or the plain language of the statute.

79.     Were Plaintiff not to have the right to sue on Kyree's behalf for a wrongful denial of benefits, as alleged herein, due to Kyree's untimely death as a result of Defendants' wrongful denial, Defendants would be incentivized to prolong future claims and appeals until the participant dies, as here, thereby absolving them from liability.

80.     Plaintiff seeks the full value of the heart transplant and any related services, as well as all other benefits to which Kyree would have been entitled had he lived.

81.     As a result of the conduct of Defendants, Plaintiff has suffered significant damages, including medical expenses, attorney fees, and costs.

SECOND CLAIM FOR RELIEF:
BREACH OF FIDUCIARY DUTY
UNDER ERISA, 29 U.S.C. § 1132(a)(3)

82.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

83.     Plaintiff alleges this claim for relief in the alternative to the extent that any relief is duplicative of the benefits sought under the First Claim for Relief, but not with

respect to relief sought that is in addition to or exceeds the relief sought under the First Claim

for Relief that may be awarded under the Court's power to order equitable, remedial, or other

appropriate relief.

84.     At all relevant times alleged herein, Defendants were both named and

functional fiduciaries of the Plan and were acting in a fiduciary capacity with respect to the

specific issues alleged herein, including all conduct, actions, and inaction alleged.

85.     29 U.S.C. § 1132(a)(3), provides that:

> A civil action may be brought by a participant, beneficiary, or
> fiduciary (A) to enjoin any act or practice which violates any
> provision of this subchapter or the terms of the plan, or (B) to
> obtain other appropriate equitable relief (i) to redress such
> violations or (ii) to enforce any provisions of this subchapter or
> the terms of the plan.

86.     29 U.S.C. § 1109(a), provides that:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

87.     29 U.S.C. § 1104(a)(1)(A), obligates a fiduciary to "discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive

purpose of providing benefits to participants and their beneficiaries and defraying reasonable

expenses of administering the plan."

88.     29 U.S.C. § 1104(a)(1)(B), obligates a fiduciary to act "with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man acting in

a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

89.     29 U.S.C. § 1104(a)(1)(D), obligates a fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."

90.     These ERISA fiduciary duties have been described repeatedly by courts as "the highest known to the law."

91.     By their conduct, actions, and inaction alleged herein, Defendants, both individually and collectively, breached their fiduciary duties in at least the following ways:

     a.     By failing to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

     b.     By failing to act solely in the interest of and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan;

     c.     By failing to discharge its duties or otherwise act in accordance with the documents and instruments governing the Plan;

     d.     By misapplying or misinterpreting Plan language, terms, definitions, and criteria to deny Kyree's claim for a heart transplant and associated services;

     e.     By finding that Kyree's claim does not meet relevant Plan standards, definitions, and/or criteria for coverage;

f. By failing to certify, approve, or authorize Kyree's heart transplant;

g. By wrongfully withholding benefits due and owing;

h. By unreasonably delaying the approval of Kyree's claim for a heart transplant and associated services where his condition was critical and time was of the essence, resulting in Kyree's death;

i. By not approving and certifying Kyree's claim for a heart transplant;

j. By applying inapplicable InterQual criteria to Kyree's claim;

k. By misinterpreting and misapplying InterQual criteria to Kyree's claim, including but not limited to requiring that Kyree have been alcohol-free for 6 months prior to the heart transplant in order to qualify for coverage, where no such requirement exists;

l. By ignoring Kyree's medical team's opinions that even if a 6-month alcohol free requirement existed – which it did not – that Kyree had a sufficient social structure and support system and counseling to alleviate any such concerns;

m. By finding that Kyree's claim for a heart transplant did not satisfy the criteria to perform the external review on an expedited basis within 72 hours;

n. By not making a determination on external review on an expedited basis within 72 hours;

o. By failing to accord proper weight to the evidence in the administrative record and/or claim file;

p. By mishandling essential Plan functions delegated to them;

q. By failing to administer the plan fairly and impartially, for the

exclusive benefit of participants and beneficiaries under the Plan, including the Plaintiff in this case.

r.      By failing to exercise appropriate authority or control over Plan assets;

s.      By failing to monitor Defendant UMR and failing to ensure its compliance with the Plan, ERISA, and otherwise applicable laws and regulations;

t.      By failing to monitor Defendant Quantum and failing to ensure its compliance with the Plan documents, ERISA, and otherwise applicable laws and regulations;

u.      By failing to monitor Defendant MCMC and failing to ensure its compliance with the Plan documents, ERISA, and otherwise applicable laws and regulations; and

v.      By breaching and/or otherwise violating the express and/or implied agreements, terms, conditions, promises, representations, and warranties contained in the governing Plan documents.

92.      Kyree died waiting for a heart transplant due to Defendants' actions.

93.      By and through their conduct, actions, and inaction alleged herein, Defendants breached their fiduciary duties to Plaintiff under the Plan, the SPD, ERISA and its promulgating regulations, and as otherwise proscribed by law.

94.      Defendants' fiduciary obligations to Plaintiff exist regardless of any purported grant of discretionary authority. As such, the standard of review applicable to this claim is *de novo*.

95.      Plaintiff, on behalf of Kyree, suffered an equitable injury(ies) as a result of

Defendants' breach of fiduciary duty, including but not limited to the loss of the heart transplant and associated services, as well as enduring significant pain, suffering, unnecessary degradation of health, loss of quality of life, and ultimately, Kyree's death.

96.     ERISA permits Plaintiff to sue for breach of fiduciary duty, which is not extinguished by death either under case law or the plain language of the statute.

97.     Were Plaintiff not to have the right to sue on Kyree's behalf for breach of fiduciary duty, as alleged herein, due to Kyree's untimely death occurring as a direct and proximate result of their breaches, Defendants would be incentivized to prolong future claims and appeals until the participant dies, as here, thereby absolving them from liability.

98.     Plaintiff seeks equitable relief in the form of the full value of the heart transplant and any related services, as well as all other benefits to which Kyree would have been entitled had he lived.

99.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff has suffered harm and damages, and is entitled to have judgment entered in her favor and against Defendants in an amount to be determined at trial.

100.    Pursuant to ERISA 29 U.S.C. § 1132(a)(3), this Court should award appropriate equitable, remedial, or "make whole" relief to redress Defendants' violations of ERISA and the Plan and to enforce the provisions of ERISA and the Plan.

101.    Plaintiff is entitled to such equitable relief as this Court may deem appropriate, including but not limited to surcharge, disgorgement of ill-gotten profits and gains, imposition of a constructive trust, restitution, equitable estoppel, and/or any other appropriate equitable relief.

WHEREFORE, Plaintiff prays that the Court:

1. Find that Plaintiff is entitled to sue Defendants for recoupment of benefits due under the Plan;

2. Grant Plaintiff declaratory and injunctive relief, finding that she is entitled to recover for Kyree's healthcare benefits under the terms of the Plan;

3. Grant Plaintiff declaratory and injunctive relief, finding that Kyree was entitled to coverage for the heart transplant procedure and related services and other associated health benefits under the terms of the Plan, and that Defendants be ordered to pay the benefits owed;

4. Grant Plaintiff a declaratory judgment finding that Kyree's heart transplant procedure was medically necessary and therefore a covered treatment under the terms of the Plan;

5. Declare that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries under ERISA;

6. Grant Plaintiff injunctive or other appropriate equitable relief, finding that she is entitled to healthcare benefits to remedy the breach of fiduciary duty;

7. Compel Defendants to make good to Plaintiff for all losses resulting from Defendants' breach of fiduciary duty;

8. Award declaratory and injunctive relief, finding that Plaintiff is entitled to recover from Defendants the actual damages and all other losses incurred as a result of Defendants' breach of fiduciary duty;

9. Award monetary damages in an amount to be proven at trial;

10. Grant Plaintiff appropriate equitable relief against Defendants, as permitted by law, equity, and the federal statutory provisions set forth herein, including but not limited to surcharge, disgorgement, constructive trust, restitution, equitable estoppel, and/or any other appropriate remedial relief;

11. Award Plaintiff prejudgment interest of at least the North Carolina legal rate of 8%;

12. Award Plaintiff all reasonable attorneys' fees and expenses incurred as a result of Defendants' actions alleged herein pursuant to 29 U.S.C. § 1132(g) or as otherwise provided by law; and

13. Award such other and further relief as this Court may deem just and proper.

This the 20th day of December, 2019.

/s/Norris A. Adams, II
**NORRIS A. ADAMS, II**
N.C. Bar No. 32552
E-mail: nadams@essexrichards.com
**CAITLIN H. WALTON**
N.C. Bar No. 49246
Email: cwalton@essexrichards.com
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, NC 28203-4727
Phone: (704) 377-4300
Facsimile: (704) 372-1357

*Attorneys for Plaintiff*